# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CHRISTOPHER A. YOUNG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:10-cv-1001-TWP-MJD |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Christopher A. Young ("Young"), requests judicial review of the decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner"), denying Young's application for Supplemental Security Income ("SSI") benefits under the Social Security Act, 42 U.S.C. § 301, *et seq.* For the reasons set forth below, the Commissioner's decision is **AFFIRMED**

## I. BACKGROUND

### A.      Procedural History

Young applied for SSI on July 9, 2004, alleging a disability onset date of May 22, 2004. His application was denied initially and following reconsideration. On August 6, 2008, Administrative Law Judge Peter C. Americanos (the "ALJ") conducted a hearing, where Young, his mother Rhonda Young ("Ms. Young"), a medical expert, and a vocational expert testified. Ultimately the ALJ found that Young was not disabled. On June 17, 2010, the Appeals Council denied review, thus making the ALJ's decision final. 20 C.F.R. § 404.981.

**B.      Factual Background**

The facts of this case are quite extensive. However, Young's arguments are solely focused on the ALJ's decision regarding his brain injury and mental impairments. Therefore, the Court's factual summary is largely confined to the facts relevant to these issues.

On May 22, 2004, Young was an unrestrained backseat passenger in a van that was "t-boned" by a large truck. Tr. at 242. Young was 19 years old at the time of the accident. Tr. at 242. When Young arrived at Wishard Memorial Hospital in Indianapolis, Indiana, he complained of abdominal pain, and was subsequently diagnosed with a serious liver laceration. Tr. at 242. He also received treatment for internal bleeding. Tr. at 576. Young had a past medical history which included depression and anxiety. Tr. at 242. After being hospitalized for seven days, he was released on May 29, 2004. Tr. at 242. On May 30, 2004, Young returned to the hospital complaining of increased jaundice, abdominal distention and abdominal pain. Tr. at 483. When the doctors found bile had leaked into his abdomen, Young was rushed into surgery. Tr. at 250-251. A CT scan was also administered, and the report showed questionable hypodensity. Tr. at 996. On June 4, 2004, Young was placed on full ventilator support due to respiratory failure. Tr. at 239.

Young was discharged from the hospital to an acute care rehabilitation facility on August 30, 2004. Tr. at 241. As part of his discharge instructions from the hospital, it was suggested that he follow up with psychiatry within two weeks for issues with anxiety. Tr. at 241. On September 3, 2004, Young was finally released to go home. Tr. at 334. Upon this discharge, he was ordered to follow up with Midtown Psychiatry. Tr. at 334. The discharge notes also indicated that a rehab neuropsychological evaluation was to be conducted. Tr. at 334.

On September 28, 2004, Young saw Dr. Wayne Snyder ("Snyder"), and reported having problems with anxiety. Tr. at 223. Snyder noted Young's affect was "blunted," and opined he had symptoms of depression or anxiety. Tr. at 223. On October 19, 2004, Young saw Snyder again and reported his anxiety was much improved, but he was still having problems around crowds of people. Tr. at 224. Snyder opined that there was still "a little" room for improvement regarding Young's anxiety, so he increased Young's Zoloft prescription. Tr. at 224.

On October 4, 2004, Young saw a consultative examiner.[1] Tr. at 431. This examiner found no evidence of a mental impairment or memory problems. Tr. at 433. The examiner noted that Young had a history of depression and anxiety, but it appeared to be stable on medications. Tr. at 433. On October 23, 2004, Ms. Young completed a disability questionnaire and stated her son was unable to care for himself, and "he cries a lot and feels bitter that he's unable to live a normal life and stays awake a lot." Tr. at 94. She also stated he was unstable and "could not focus on any one thing." Tr. at 96. When answering a question about Young's ability to get along with family and friends, Ms. Young wrote:

> He's become angry because of his mental problems, the scars on his body, can't walk straight and he lashes out at the family. But this I understand because before accident he could do anything. Graduated last year and it has taken a whole summer from him plus the scarred body and trying to cope with it as best as he can.

Tr. at 97.

On November 23, 2004, Dr. Barrow ("Barrow") performed a psychological evaluation of Young. Tr. at 228-234. Young reported memory problems, depression and anxiety. Tr. at 229. Specifically regarding his memory, Young reported he lost his memory "for a while," and stated "I needed to re-do my colors and stuff like that – my memory is coming back slow – sometimes I

---

[1] The doctor's name is illegible.

can't remember the names of friends." Tr. at 229. He also reported he would think about the accident during the day, and have recurring dreams about it. Tr. at 229. When observing Young's appearance and behavior, Barrow reported he was cooperative, but described his overall mood as depressed and frequently tearful. Tr. at 230. Barrow stated Young became tearful when talking about how the accident "messed up" his life. Tr. at 230. Barrow reported Young's capacity for abstraction was slightly limited, and his comprehension was somewhat limited and overly concrete at times. Tr. at 231. Regarding memory and concentration, Barrow opined Young's general memory was "somewhat affected." Tr. at 231. Young was able to remember the year he was born, the name of the last high school he attended and what year he graduated. Tr. at 231. However, he could not remember who the current president was at the time. Tr. at 231. Young was able to immediately recall two of three objects he was asked to remember. Tr. at 232. When asked to recall the same three objects again, he recalled all three correctly. Tr. at 232. However, after five minutes, he was only able to recall two of the three objects, even when given a clue. Tr. at 232. Young was able to remember when he had his last meal the day before, and what he ate. Tr. at 232. He was also able to recall four digits forward, and two backwards. Tr. at 232. Barrow further found Young's concentration to be significantly affected. Tr. at 232. Barrow also reported Young had difficulty performing serial threes, and had difficulty counting backwards from twenty to one. Tr. at 232. Barrow opined that Young's computational ability and concentration appeared to be significantly affected, and his general memory functioning appeared to be slightly affected. Tr. at 233. He also opined Young's formal judgment appeared to be relatively intact. Tr. at 233.

In March 2005, Social Security set up a psychological examination, but Young refused to attend. Tr. at 179. He told Ms. Young he did not want a "psych doctor picking his brain." Tr. at

179.  During a telephone conversation with the Social Security case manager, Ms. Young stated he does not go out of the house much by himself, his anxiety levels increase around others, he gets angry, and he cannot remember details of conversations.  Tr. at 180.  She also stated he was always more of a "loner," but it had worsened since the accident.  Tr. at 180.  On November 8, 2005, Ms. Young told Snyder that Young was unwilling to leave the house, and he claimed to have held a gun to his head; however, she did not know if he really had a gun.  Tr. at 1077.  Ms. Young also stated that Young was unwilling to be seen at the doctor's office.  Tr. at 1077. Snyder suggested that Young needed a psychiatric evaluation because of possible schizophrenia. Tr. at 1077.  Snyder also stated he would like Young to get an MRI of his head to rule out any intracranial pathology.  Tr. at 1077.

On June 24, 2005, Dr. Pate ("Pate") administered a Wechsler Memory Scale 3rd Ed. ("WMS-III") test.  Tr. at 161.  The test is designed to produce scores in eight primary categories, each with a mean score of 100.  Tr. at 161.  An average score is between 90-109, and a low average score is 80-89.  Tr. at 161-162.  Young's mean score was 50, which was well below average.  Tr. at 163.  Regarding the test, Pate noted "Mr. Young displayed sufficient cooperation and effort to ensure the test results reported…[were] valid, and an accurate reflection of his…memory ability.  His behavior was considered consistent with test findings."  Tr. at 161.

On July 18, 2005, Dr. Gange ("Gange"), a state agency medical consultant, completed a mental residual functional capacity assessment, and a psychiatric review technique.  Tr. at 126-143.  Gange found that Young was not significantly limited in fourteen out of twenty categories, including the ability to remember locations and procedures; remember, understand, and carry out short and simple directions; maintain concentration for extended periods; perform activities on a schedule; maintain punctuality and regular attendance in a normal work week; and respond

appropriately to supervisors.  Tr. at 126-127.  Gange found Young was moderately limited in his ability to understand and carry out detailed instructions; respond appropriately to changes and supervisors; set realistic goals; and get along with coworkers.  Tr. at 126-127.  Gange further found that Young had moderate limitations in maintaining social functioning and concentration, persistence, and pace.  Tr. at 140.  In conclusion, Gange found that Young's impairments might interfere with complex task completion, but he could perform simple, repetitive tasks with limited public contact.  Tr. at 128.

On November 20, 2005, an MRI of Young's brain was normal.  Tr. at 1097.

On February 9, 2006, Ms. Young reported to Snyder that Young had refused to leave the house for a week because of his anxiety.  Tr. at 1076.  On February 17, 2006, Young went to see Snyder for the first time in several months, and Snyder reported his anxiety was better.  Tr. at 1076.  Young saw Snyder again on June 9, 2006, and Snyder noted "[Young] still has quite a bit of problems with anxiety and depression."  Tr. at 1075.  Another note on this report stated Young had not slept in the past two days.  Tr. at 1075.  On October 12, 2007, Young's grandmother reported that he was agoraphobic and tended to stay in his dark room.  Tr. at 1069.

On March 7, 2007, Young was seen by Brian Nichelson ("Nichelson"), a psychologist.  Tr. at 1119.  Nichelson noted that Young was suffering from cognitive damage from the accident, and had difficulty with memory as well as decision-making.  Tr. at 1119.  Nichelson stated Young had become frustrated, angry, somewhat aggressive, and very agitated.  Tr. at 1120.  Nichelson also stated Young would be a probable candidate for Vocational Rehabilitation, but he did not know how much Young would be able to do given his impairment.  Tr. at 1119.

On May 13, 2008, Young was assessed by St. Francis Hospital and Mental Health Services.  Tr. at 1136-1139.  The assessment form noted that Young had problems with short and

long term memory and that his judgment was poor. Tr. at 1138. It was also noted that Young had poor social and coping skills. Tr. at 1139. His diagnostic impression was assessed as mood disorder, due to traumatic brain injury. Tr. at 1139. A treatment plan was designed in which an electroencephalogram ("EEG") was ordered. Tr. at 1139. The EEG was performed on June 26, 2008, and the results were satisfactory. Tr. at 1124.

On July 16, 2008, Snyder was interviewed by Young's attorney. Tr. at 1140. Snyder stated that Young showed obvious signs of anxiety and depression, had developed problems of agoraphobia, and had difficulty leaving his home or room because of anxiety. Tr. at 1142. Snyder also opined that due to his level of anxiety, agoraphobia, and mental capacity, it would be virtually impossible for Young to arrive to work at a certain time and perform duties on a regular basis. Tr. at 1142. Lastly, Synder opined his concentration abilities would be markedly limited because he was too anxious in his surroundings to focus on a job. Tr. at 1143.

## C. The Administrative Hearing

### 1. Medical Expert Testimony

The administrative hearing was held on August 6, 2008. Tr. at 1147. Dr. Olive ("Olive"), who had reviewed the record, testified as a medical expert. Tr. at 1147. In summarizing the record, Olive testified that Young had moderate and possibly severe limitations in concentration, pacing and persistence. Tr. at 1150. Olive further stated that Young had mild problems with immediate memory, his general memory was slightly affected, and his formal judgment was intact. Tr. at 1148.

When examined by ALJ about limitations, Olive opined that he would put limitations on Young's contact with the general public because of his depression, anxiety, and symptoms of Post-Traumatic Stress Disorder I. Tr. at 1152.

When discussing the results of the WMS-III test, Olive acknowledged the extremely low results, and said they could be consistent with a head injury. Tr. at 1150, 1158. He also testified that if the WMS-III test was correct, Young's ability to do simple tasks would be impaired. Tr. at 1160. However, Olive testified the test results were inconsistent with other evidence in the record. Tr. at 1150. Olive opined that Young was capable of performing simple and repetitive tasks. Tr. at 1150.

## 2. Young's Testimony

When examined by the ALJ, Young testified that he knew he had insurance, but could not remember what kind. Tr. at 1162. He testified that his biggest problem was that he could not remember anything. Tr. at 1176. He also stated that he "flips out" on his parents. Tr. at 1176. When examined about an arrest in 2005, Young testified that he stole his mother's car. Tr. at 1165. He further remarked "I don't even know what I was doing. She hid the keys from me and I still found them." Tr. at 1165. Young testified that when he was arrested, the police found his grandmother's handgun and marijuana in his possession. Tr. at 1165. Young stated that at the time he was on Fentanyl patches, and he was not supposed to be driving. Tr. at 1166. Young testified that he thought they put him on probation, but he was not sure. Tr. at 1166. When the ALJ examined Young about a second arrest, he had no recollection of it.[2] Tr. at 1166.

The ALJ asked Young when the last time he smoked was, and Young replied he did not smoke after the accident (2004). Tr. at 1164. When the ALJ pointed out that his medical record showed he quit in March of 2007, Young repeated again that he smoked before the accident. Tr.

---

[2] During the entire line of questioning regarding his arrests, Young seemed very confused about what happened. For example, when the ALJ asked him if he was arrested, his answer was "[t]hats what they say, yes, they say that." R. at 1165.

at 1164. Later in the testimony, Young stated he could not remember when he last smoked. Tr. at 1172.

During Young's testimony, the ALJ asked him if he had taken any trips outside of the State of Indiana, and Young responded that in 2007 he went to a law conference in Florida. Tr. at 1175. Ms. Young then immediately told the ALJ that "[h]e doesn't hardly leave the house so I don't know what he's thinking about. The last time he's been in Florida was 2003." Tr. at 1175. Young further testified he did not believe he could live on his own because of his psychological problems.[3] Tr. at 1179.

### 3. Ms. Young's Testimony

When examined by Young's lawyer, Ms. Young testified that before the accident Young was a reliable source for information, but afterwards he was not a reliable "historian" because of his memory problems. Tr. at 1187. She also testified that his moods vary significantly. Tr. at 1187. She further stated that he could not maintain a schedule at a job unless she went with him. Tr. at 1188.

### 4. Vocational Expert Testimony

The ALJ asked the Vocational Expert, Robert Barber (the "VE"), whether jobs existed for a hypothetical worker of Young's age, education and work experience. Tr. at 1191. This hypothetical worker could work at the sedentary level; was limited to no more than superficial interaction with the general public, coworkers, and supervisors; was restricted to simple repetitive work; and could occasionally climb stairs. Tr. at 1191-1192. The VE testified that the positions of telephone quotation clerk, electronic assembler, and para-mutual ticket checker

---

[3] When asked specifically about his psychological problems, Young stated he was scared of hurting himself, collapsing to the ground or dying in his sleep. R. at 1180.

existed in sufficient numbers in the regional economy and could be performed by the hypothetical worker.  Tr. at 1192.

The VE also testified that if a person had a severely impaired memory, the person would have extreme difficulty performing the previously mentioned jobs.  Tr. at 1194.

## II. <u>DISABILITY AND STANDARD OF REVIEW</u>

To be eligible for disability benefits, a claimant must prove that he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423 (d)(1).

An ALJ uses a five-step sequential evaluation process to determine if a person is disabled.  Specifically, 20 C.F.R. § 404.1520 provides as follows:

1.  If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2.  If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3.  If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4.  If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5.  If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant at the first four steps; it then shifts to the Commissioner at the fifth step. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (citation omitted).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become the findings of the Commissioner. *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). A court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999) (citations omitted).

In reviewing the ALJ's findings, the court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Nelson*, 131 F.3d at 1234. While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Further, the ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (citations omitted). However, when the ALJ makes a decision he "must confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003) (citation omitted). The ALJ must also sufficiently explain his assessment of the evidence in order to allow the reviewing court to trace the path of reasoning. *See Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (citations and internal quotations omitted). If adequate discussion of the issues is not given, the decision will be remanded. *See Brisco*, 425 F.3d at 351 (citation and internal quotations omitted); *see also Zurawski v. Halter*, 245 F.3d 881, 888-89 (7th Cir. 2001).

# III. DISCUSSION

## A.      The ALJ's Findings

After considering all the evidence, including the testimony at the hearing, the ALJ determined that "[b]ased on the application for supplemental security income protectively filed on July 9, 2004, [Young] is not disabled under section 1614(a)(3)(A) of the Social Security Act." R. at 23.  In making his ruling, the ALJ made the following findings:

1.      The Claimant has not engaged in substantial gainful activity since July 9, 2004, the application date (20 CFR § 416.920(b)) and § 416.971 *et seq*.).

2.      The Claimant has the following severe combination of impairments: residual injuries from motor vehicle accident, right knee ossification, depression, anxiety and post traumatic stress disorder (20 CFR § 416.920(c)).

3.      The Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§§ 416.920(d), 416.925 and 416.926).

4.      The Claimant has the residual functional capacity to perform the following range of work: lifting or carrying 10 pounds frequently; lifting or carrying 20 pounds occasionally; standing or walking, off and on, for six hours during an eight hour day; intermittent sitting; and using hands and arms for grasping, holding and turning objects.  The Claimant is restricted to no more than occasional climbing of stairs.  The Claimant's work must require only simple and repetitive tasks, and no more than superficial interaction with the public, coworkers and supervisors.

5.      The Claimant is unable to perform any past relevant work (20 CFR § 416.965).

6.      The Claimant was born on September 24, 1984, and was 19 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR § 416.963).

7.      The Claimant has at least a high school education and is able to communicate in English (20 CFR § 416.964).

8.      Transferability of job skills is not an issue in this case because the Claimant's past relevant work is unskilled (20 CFR § 416.968).

9.      Considering the Claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the Claimant can perform (20 CFR §§ 416.960(c) and 416.966).

10. The Claimant has not been under a disability, as defined in the Social Security Act, since July 9, 2004, the date the application was filed (20 CFR § 416.920(g)).

## B. Analysis

Young raises the following questions on appeal: (1) did the ALJ erroneously discount the opinion of Young's treating physician; (2) did substantial evidence support the ALJ's finding that Young did not suffer from a traumatic brain injury and a severe memory impairment; (3) did the ALJ properly weigh the evidence regarding the WMS-III test; and (4) was Olive qualified to testify as a medical expert? Each question is addressed in turn below.

### 1. Did the ALJ erroneously discount the opinion of Young's treating physician

Young argues the ALJ erroneously discounted the opinion of his treating physician, Snyder, that he could neither maintain a regular schedule nor perform job duties. However, SSR 96-5p provides that the final responsibility for deciding whether an individual is disabled is reserved for the Commissioner, and "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance." Furthermore, SSR 96-5p provides that when a case record contains an opinion from a medical source on an issue reserved for the Commissioner, the ALJ must "evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." Snyder's opinion was contradicted by substantial other evidence showing that Young could maintain a regular schedule and perform simple repetitive work. The ALJ appropriately considered all the relevant evidence, and articulated his reasoning for making his determination; therefore, the ALJ did not err when he discounted Snyder's opinion.

2. **Did substantial evidence support the ALJ's finding that Young did not suffer from a traumatic brain injury and a severe memory impairment?**

In this case, the ALJ found Young had residual injuries from the motor vehicle accident, right knee ossification, depression, anxiety and post-traumatic stress disorder, but he was not disabled under section 1614(a)(3)(A) of the Social Security Act. R. at 14, 23. The ALJ also ruled Young could perform work that required only simple and repetitive tasks; no more than superficial interaction with the public, coworkers and supervisors; and required no more than the occasional climbing of stairs. Tr. at 17.

Young argues the greater weight of the evidence establishes he suffered from a traumatic brain injury. To buttress his argument, Young points to the results from a CT scan in 2004 that showed questionable hypodensity, results from a psychological examination in 2004 that showed he had difficulties computing numbers and his fund of general information was limited, and another psychiatric evaluation in 2007 that revealed he was suffering from cognitive damage.

It is important to remain mindful that the Court will uphold the ALJ's decision if it is supported by substantial evidence. *Henderson*, 179 F.3d at 512. The ALJ articulated several different explanations to support his finding that Young did not have a traumatic brain injury. For example, the ALJ discussed the results from an MRI of Young's brain taken in November 2005, which were normal. R. at 14. He also discussed an EEG that was performed in June 2008, which revealed satisfactory results and no organic disturbance. Tr. at 17. Additionally, the ALJ considered Young's testimony at the hearing in which he remembered past treating physicians, medications, and details regarding his past legal problems. Tr. at 15. After weighing the objective and subjective evidence above, the ALJ concluded that Young did not suffer from a traumatic brain injury. Tr. at 15. It is well-settled that the ALJ must explain his assessment of the evidence in enough detail to allow the reviewing Court to trace the path of reasoning. *See*

*Rohan*, 98 F.3d at 971. The Court believes the ALJ's path of reasoning is apparent, and the determination that Young did not suffer from a traumatic brain injury is supported by substantial evidence. Therefore, this argument is rejected.

Young further argues substantial evidence did not support the ALJ's ruling that he did not have a memory impairment. The Court disagrees. On this point, the ALJ considered several different pieces of evidence. R. at 19-20. He discussed the examination conducted by Barrow and the mental health evaluation performed at St. Francis Psychiatric Mental Health Services, both of which indicated Young's mental impairments were moderate. Tr. at 19. In addition, the ALJ considered Young's repeated refusals to go to consultative examinations. Tr. at 19. Specifically, he noted the testimony by Ms. Young that she "could not get him to go [to the exams]." Tr. at 19. The ALJ also considered Nichelson's examination of Young. He noted Nichelson's opinion that Young was "clearly suffering from cognitive damage from the accident…". However, the ALJ also considered the fact that Nichelson only saw Young one time. Tr. at 19. He further mentioned that Nichelson failed to clarify the severity of Young's condition, and opined Young was a candidate for vocational rehabilitation. Tr. at 19. The ALJ also considered evidence from Young, Ms. Young, and Snyder regarding Young's suspected agoraphobia. Tr. at 19. Snyder opined Young had problems of agoraphobia; however, three other psychiatrists in the record did not diagnose Young with agoraphobia. Tr. at 19. Finally, the ALJ considered the inconsistencies in Young's testimony at the administrative hearing. Tr. at 19. The ALJ noted how Young's testimony that he could not leave the house was in direct contrast with his criminal activity. Tr. at 19. Specifically, the ALJ considered that Young stole his mother's car twice, stole his grandmother's gun, obtained marijuana, and drove 40 miles in

the middle of the night.  Tr. at 19.  The ALJ found this behavior was not consistent with a person who had a disabling memory impairment.  Tr. at 20.

This Court performs a limited review of the ALJ's decision.  *See* 42 U.S.C. § 405(g).  As mentioned above, the Court cannot reweigh evidence or substitute its own judgment for that of the Commissioner.  *Nelson*, 131 F.3d at 1234 (citations omitted).  The evidence described above is sufficient to allow the Court to trace the ALJ's path of reasoning.  Young argues the ALJ "failed to comment" on several pieces of evidence and testimony.  However, it is well-established that the ALJ need not discuss every piece of evidence in writing.  *Carlson*, 999 F.2d at 181 (citations omitted).  In summary, the Court finds no error in the ALJ's articulation of his decision regarding Young's memory impairment; accordingly, this argument is rejected.

### 3.  Did the ALJ properly reject the results from the WMS-III test?

Young next contends is that the ALJ used insufficient evidence to reject the WMS-III test results showing he had a severe memory impairment.  To that end, Young argues, (1) the ALJ improperly weighed medical expert evidence; (2) the ALJ incorrectly found that even if there was a memory impairment, it did not last for a period of 12 straight months; and (3) the ALJ should not have relied on Olive's testimony because his qualifications were never established

### a.  The ALJ's weight of medical expert evidence

Young argues that the ALJ improperly discounted Dr. Arnold's ("Arnold") observations, the St Francis psychologist's findings, and Ms. Young's testimony regarding Young's memory impairment.  Along similar lines, Young contends that the ALJ erred by ascribing significant weight to the consulting physician's examination, which found no evidence of memory problems.  These arguments fail for two reasons: (1) they merely invite the court to reweigh

evidence; and (2) the ALJ used far more evidence than just the consulting physician's examination to make his determination.

Before delving into the argument regarding the weight the ALJ assigned to Arnold's observations and the findings of the St. Francis psychologist, the Court must first determine the type of medical sources they are. If they are treating sources, the ALJ was required to give their opinions controlling weight, as long as the opinions were supported by medical findings and consistent with substantial evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2). If they were non-treating sources, controlling weight was not mandatory. *See* 20 C.F.R. § 404.1527(d)(1) (explaining that more weight is given to treating sources than to non-treating sources). A non-treating source is "a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an *ongoing treatment relationship* with you." 20 C.F.R. § 404.1502 (emphasis added). The Court considers Arnold and the psychologist at St. Francis non-treating sources. The record does not reflect Young had "ongoing" treatment relationships with either of these two sources. Therefore, their opinions were not entitled to controlling weight.

When evaluating Young's memory impairment, the ALJ adopted the opinion of the consultative examiner who found no evidence of memory problems. R. at 14. However, in conjunction with the consulting physician's opinion, the ALJ also relied on Olive's testimony that he could not conclude the results from the WMS-III test alone were conclusive evidence of a traumatic brain injury in light of other evidence in the record. Tr. at 14. Additionally, the ALJ relied on Young's comment to Barrow admitting that he lost his memory "for a while," but it was coming back. Tr. at 14. Also, as mentioned earlier, the ALJ relied on several pieces of objective evidence. Tr. at 14. The ALJ was not obliged to adopt the opinion of Arnold. *See*

*Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (ALJ has discretion to weigh competing opinions, as long as his decision is supported by substantial evidence) (citation and internal quotations omitted). "In the case of dueling doctors, it remains the province of the hearing officer to decide whom to believe …". *Dray v. R.R. Retirement Bd.*, 10 F.3d 1306, 1311 (7th Cir. 1993). Furthermore, "resolution of evidentiary conflicts lies within the exclusive domain of the hearing officer[.]" *Id.* (citation and internal quotations omitted). The ALJ appropriately used his discretion in deciding which medical opinions to adopt, and his opinions were supported by substantial evidence; therefore, the Court will not disturb his judgment regarding this issue.

Young's next argument is that the ALJ improperly weighed the evidence of the consulting physician's examination against the St. Francis psychologist's examination. The Court disagrees. The record shows the St. Francis examination revealed Young had problems with his short and long term memory. R. at 1138. A "problem" with short and long term memory does not necessarily signify a debilitating memory impairment. Furthermore, if backed by substantial evidence, the ALJ has discretion to decide which doctor's testimony he accepts. *Dray,* 10 F.3d at 1311. One doctor opined Young did not have memory problems, and one opined that he did; it is not the Court's duty to reweigh this divergence in evidence. *Nelson,* 131 F.3d at 1234 (citations omitted). The Court finds that the ALJ, as a whole, sufficiently explained why the consulting physician's opinion and the other medical evidence in the record support his decision. Therefore, this argument is rejected.

The ALJ also properly weighed the consultative examiner's opinion versus the testimony of Young and Ms. Young. With respect to Young's testimony, the ALJ found he was not credible. R. at 17. The ALJ highlighted Young's "selective memory," that is, he was able to remember a specific physician and prescribed medication from 2005, and details from his past

legal problems. Tr. at 15. The ALJ also found Young's criminal activity was in direct contradiction with his testimony of a severe disability. Tr. at 18-19. The ALJ also gave consideration to the testimony of Ms. Young. Tr. at 18. The ALJ discussed Ms. Young's comments that Young did nothing but watch television and play video games. Tr. at 18. But when contacted by the Social Security Administration, Ms. Young indicated Young was able to make simple meals and do light housework. Tr. at 18, 83. Aside from the abundance of evidence above, the ALJ also discounted the testimony that Young could do nothing but watch TV and play video games because it could not be objectively verified. Tr. 18, 83. The ALJ appropriately considered Young and Ms. Young's testimony, and fully supported his reasoning with the objective and subjective evidence from the record.

> **b.** **Did the ALJ erroneously find that there was not a memory impairment that lasted 12 consecutive months?**

Next, Young argues that the ALJ was wrong to find that there was no evidence the memory impairment lasted at least 12 months. As noted earlier, a disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which…has lasted or can be expected to last for a *continuous period of not less than 12 months*." 42 U.S.C. § 423(d)(1) (emphasis added). To support his argument, Young points to Arnold's 2005 notation of memory problems, Dr. Nicholsen's 2007 examination showing that Young was suffering from cognitive damage, and the 2008 St. Francis evaluation showing problems with short and long term memory. Young also asserts that his memory problems should have been "abundantly clear" to the ALJ at the administrative hearing.

Young's argument is not persuasive. At the administrative hearing, Olive testified that the low scores from the WMS-III test were cause for concern; however, he could not conclude the results alone showed a traumatic brain injury in light of all the other evidence in the record.

R. at 14.  Olive further testified that relying exclusively on the WMS-III test would not be sound analysis, given the other evidence in the record. R. at 16.  Moreover, the ALJ relied on the two exams that occurred shortly after the accident, which revealed only moderate memory problems. The Court takes into consideration the low scores of the WMS-III test, but evidentiary disputes are resolved by the ALJ. *Dray*, 10 F.3d at 1311 (citation and internal quotations omitted). Furthermore, even if reasonable minds could differ about Young's disability, the Court must affirm the ALJ's decision to deny benefits if it is supported by substantial evidence. *See Books v. Chater,* 91 F.3d 972, 978 (7th Cir. 1996).

In a similar vein, Young argues it should have been "abundantly clear" to the ALJ that he had a memory problem.  As mentioned earlier, the ALJ found Young showed a selective memory, and his criminal activities did not reflect a severe disability.  Tr. at 15, 18-19.  With these findings, the ALJ ruled that Young was not credible.  Tr. at 17.  The ALJ also thoroughly explained his credibility assessment within the guidelines of SSR 96-7p.  Tr. at 18-21.  The Court finds the ALJ sufficiently explained why it was not "abundantly clear" Young had a memory problem.

The ALJ used substantial evidence to support his conclusion that Young did not have a memory impairment for a continuous period of 12 months.  Consequently, this argument is rejected.

### c. Should the Court discount Olive's testimony due to a lack of qualifications?

Young also argues Olive's testimony should be discounted because his qualifications were never established.  However, Young and his counsel had the opportunity to object to Olive's testimony or cross-examine him regarding his qualifications at the administrative hearing, but did not do so; consequently, this argument is waived.  *See. e.g., Gale v. Astue,* 2011

WL 1706485 at *6 (C.D. Cal. May 5, 2011) ("since Plaintiff did not claim at the administrative hearing that the medical expert was not a physician, she waived any objection on that basis."); *Miller v. Barnhart*, 2002 WL 32348504, at *6 (E.D. Pa. Jan 31, 2002) (ruling that the court will not address arguments regarding the expert's qualifications because plaintiff failed to raise a proper objection.). As a result, this argument is rejected.

As a final matter, it is worth noting that many of Young's precise arguments are undeveloped and difficult to ascertain. To the extent that any arguments remain unaddressed, it is due to either: (1) the Court's difficulty in discerning the argument; or (2) the fact that the argument was merely an invitation for the Court to reweigh evidence, which it cannot do. Young could have used a reply brief to flesh out some of his ancillary arguments, but he opted not to do so.

## IV. CONCLUSION

For the reasons stated herein, the decision of the Commissioner of Social Security is **AFFIRMED**.

SO ORDERED

DATE: _08/03/2011_

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Andrew P. Sheff
BENNETT & SHEFF
apsheff@bennettsheff.com,
lawoffice@bennettsheff.com